UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DEWAYNE A. DUNN,

          Petitioner,

             v.                             CAUSE NO. 3:18CV178-PPS/MGG

WARDEN,

          Respondent.

**OPINION AND ORDER**

Dewayne A. Dunn filed a pro se petition for writ of habeas corpus challenging his conviction in State court for the murder of Angel Torres. Torres and Dunn were friends and neighbors. They lived in adjacent apartments on the second floor of a small apartment building. They shared a deck with stairs leading down to ground level. The basic question at trial was whether Torres died falling down the stairs or, as the State theorized, he was bludgeoned to death by Dunn after he landed at the bottom. The case against Dunn was not a strong one. Indeed, the only two eyewitnesses supported Dunn's theory that Torres died from the fall. The State's case relied almost exclusively on the testimony of two experts, a forensic pathologist and a blood spatter specialist. Dunn's lawyer made no effort to contradict the testimony of the State's experts. Dunn was convicted of first degree murder and sentenced to a lengthy term of imprisonment. It is trial counsel's alleged ineffectiveness in failing to consult an expert pathologist that is presently before me in this habeas corpus petition. And because I find that Dunn received ineffective assistance of counsel in the trial of his case, and but for his lawyer's

subpar performance, there is a reasonable probability that he would have been

acquitted, habeas relief will be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

In deciding this habeas petition, I must presume the facts set forth by the State

courts are correct. 28 U.S.C. § 2254(e)(1). Unless otherwise noted, the facts set forth

below come from the opinion of the Indiana Court of Appeals. *See Dunn v. State*, 959

N.E.2d 935 (Ind. Ct. App. Dec. 22, 2011) (table), *trans. denied* 963 N.E.2d 1119 (Ind. Feb.

13, 2012) (table); DE 24-5 at 2-4. Occasionally, where the Court of Appeals' factual

discussion is incomplete, I have augmented it and, when I do, I cite directly from the

trial transcript (Tr.) or the transcript from the post conviction relief hearing (PCR Tr.)

(Both can be found at Docket Entry 25.)

### Facts

In September 2008, Dunn lived in an apartment in Elkhart, Indiana with his

former girlfriend, Letha Sims, and two of her sons. Their rental unit was located on the

second floor of the apartment building, next door to another unit rented by Angel

Torres. The units shared a common balcony, with an exterior staircase leading to the

ground. Dunn, Sims and Torres were friends. They would frequently sit on the porch

socializing, smoking and drinking. Tr. 500-06.

On the evening of September 3, 2008, Damen Collins was riding his bike near the

apartment building when he witnessed an altercation between a man and a woman

taking place on the balcony. Although Collins was approximately 100 feet away from

the balcony when he saw the dispute, nothing was blocking his view. Tr. 356. He claims

that it was dusk at the time. Tr. 365-66. But this was plainly incorrect; the 911 call that he

placed was received at 11:40 p.m. Tr. 384. Anyway, Collins saw what he believed to be a

man and woman fighting, heard the woman screaming for help and saw her being

pushed down the stairs. Another man then came out of his apartment, but he was

shoved back inside by the man on the balcony. At that point, Collins called 911 and left

the area. As he was leaving, Collins heard loud noises coming from the area of the fight,

but he was unsure what they were. When asked if he could describe the aggressor,

Collins testified that he didn't have a clear view of the matter. Tr. 363-64.

The first police officer arrived on the scene eight minutes after receiving the

dispatch. At that time, Torres was lying at the bottom of the staircase in a pool of blood.

He was unresponsive and his breathing was very labored. A baseball bat was

positioned underneath Torres's body, and Jamar Sims (Letha's son) and Dunn were

standing nearby. Dunn was very agitated and shouting that he "didn't do anything." Tr.

394.

At the time of Torres's death, Jamar resided in the apartment with Dunn, his

mom and his little brother. Jamar was a junior in high school. Tr. 595-96. Jamar goes by

the name "Willie" and that is how I will refer to him. Tr. 588. Willie testified that he was

present on the night Torres died and actually witnessed the altercation. Here's what he

says happened: Their apartment was on the second floor of the building and an outside

staircase led to a small balcony from which you could go into either their apartment or

Torres's. Tr. 590-93. The balcony was small, maybe four feet by ten feet. Tr. 595. And the staircase was dangerous. Tr. 562, PCR Tr. 31. According to Willie, earlier in the day, several people, including Letha, Dunn, Torres and other friends, were all on the balcony drinking. Tr. 597. Willie went to take a nap in the downstairs bedroom. (There is an interior staircase that leads down to the apartment's bedroom). Willie was awakened by Dunn who was screaming and hollering. Tr. 600-01. Willie followed Dunn upstairs and, while he was getting a drink of water, Dunn walked outside; Willie then heard an argument ensue between Dunn and Torres. Tr. 601-02. Specifically, Willie heard Dunn say "don't hit me with that bat." Tr. 601-02. Willie looked outside and saw Torres and Dunn fighting. He then saw Torres strike Dunn on the shoulder with a baseball bat. Tr. 604.

Willie's testimony that he saw Torres strike Dunn with a bat was corroborated by medical reports and photographs taken of Dunn that evening. Dunn was taken to the hospital and photos were taken of his back. Tr. 714-15. Those photos show abrasions on Dunn's shoulders consistent with being struck by a bat. Tr. 717-19. When asked at the hospital how he got the injury, Dunn told the evidence technician that he was indeed struck by a baseball bat. *Id*. Dunn also told the responding police officer the same thing. Tr. 396-97.

After seeing Torres strike Dunn with the bat, Willie saw the two wrestling over it. Both were perilously close to the top of the stairs. From Willie's vantage point, Torres had his back to the stairs and Dunn was facing Torres with his back to Willie. As Dunn

and Torres were struggling over the bat, Willie saw Torres fall backwards down the

steps. Tr. 604, 606-07. Willie was equivocal about whether Torres fell or was pushed

down the stairs. Tr. 610. On direct examination, he told the prosecutor he really wasn't

sure if Torres fell or was pushed. *Id.* On cross, he was more emphatic that Torres was

not pushed. Tr. 630. Torres was likely unsteady on his feet. He was wearing sandals and

was extremely drunk at the time. Tr. 488, 484. In either event, whether he was pushed or

he fell, Torres went down the stairs while struggling with Dunn over the bat. Tr. 630.

According to Willie, Torres landed on the bannister first, then flipped over it and hit the

pavement below head first. Tr. 608-09. Willie ran down the stairs to help and saw Torres

in a pool of blood. Tr. 611-12. From there, Willie ran to flag down a police officer. Tr.

612-13. At no time during the altercation did Willie see Dunn strike Torres with the bat

or anything else. Tr. 624, 630.[1]

　　　Willie's mother, Letha, although not an eyewitness to the confrontation between

Dunn and Torres, heard the confrontation and largely corroborated Willie's account of

events. According to Letha, by the date of the incident in question, she and Dunn were

no longer on good terms. Tr. 506. Although they continued to live with one another,

they were no longer intimate. Tr. 507. Although Letha and Torres had sex on one

occasion prior to his death, she described her relationship with Torres as more like close

friends. Tr. 508, 510. On the day in question, Letha went next door to Torres's apartment

---

[1] In its opinion denying post conviction relief, the Indiana Court of Appeals incorrectly stated that Willie never testified that Dunn did not inflict injury on Torres. *See* PCR Opinion at DE 24-12 at n.1. Yet Willie did testify to that at the pages I've cited to in the text above. Tr. 624, 630.

to have a beer while Dunn went to take the dog for a walk. Tr. 510-14. One beer led to a few which led to some Bacardi Rum. Tr. 512-13. When Dunn got home from walking the dog, he joined them. Tr. 514-15. They were all laughing and having a good time until an argument between Torres and Dunn broke out. Tr. 514. Letha did not recall what prompted the argument except to say that Torres and Dunn argued a lot, especially when they were drinking. Tr. 514.

As noted above, Torres was extremely intoxicated upon his death. According to the emergency room doctor who worked on him later that evening, his blood alcohol content was .294 making him, in the words of the attending doctor, "significantly under the influence of alcohol." Tr. 484-85. This is not surprising since he had been drinking most of the day.

According to Letha, after the argument broke out between Torres and Dunn, it spilled out onto the porch. Tr. 516. Letha and her son (Andre, not Willie) went outside to break up the fight, and then she went back inside Torres's apartment. Tr. 517-18. Torres and Dunn each went back into their own apartments. Tr. 518. At some point later, Dunn kicked the door to get back inside Torres's apartment. Tr. 519. Torres then grabbed a baseball bat, and Torres and Dunn went back outside. *Id*. Through the screen door she could hear the commotion outside as the two were tussling, and she heard Dunn tell Torres — consistent with what Willie heard — to "stop hitting me with the bat." Tr. 519-20. She remained inside because she was scared. *Id*. Finally, she heard a thud, went out on the porch, looked down and could see Torres at the bottom of the

stairs with the bat underneath him. Tr. 521-25. When Letha came out of the apartment and onto the deck, she saw Dunn standing at the top of the stairs; she then saw him descend the stairs and begin tugging on Torres's arm, imploring him to get up. *Id.*

As noted above, the first officer to arrive on the scene, Jason Runyon, observed Dunn standing next to Torres's body exclaiming,"I didn't do anything!" Tr. 394. He further told the officer that Torres had struck him with the bat and that a scuffle had ensued. Tr. 396-97. According to the officer, Torres was lying on the baseball bat when he arrived. Tr. 402. Dunn was upset but was not acting aggressively. Tr. 413-14. Another officer, Bryan Moore, also arrived on the scene. He interviewed Letha. She told him, consistent with what she later told the jury, that she heard Dunn tell Torres to stop hitting him with the bat, then she heard a thud, went outside and saw Torres on the pavement below. Tr. 461-62.

After paramedics took Torres to the hospital for treatment, police conducted an extensive forensic examination of the area. Dunn's shoeprint was found on the outside of Torres's apartment door, and the doorjamb was freshly splintered. There was also blood on the outside of the door, and crime scene investigators were able to determine that the blood was cast onto the door after the shoeprint was made. Another of Dunn's shoeprints, in what was later determined to be Torres's blood, was found on the second step of the staircase. A pool of blood on the pavement at the bottom of the staircase contained Dunn's shoeprint, and Torres's blood was found on the sole of Dunn's shoe. Blood was also found on Dunn's shorts, and DNA testing revealed a mixture of a major

and minor profile. Dunn was the source of the major profile, and no conclusions could

be drawn from the minor profile. Torres's blood was found on the handle and middle

portion of the baseball bat, but not on the barrel of the bat. Tr. 836-37.

When Torres arrived at the emergency room, physicians determined that he had

suffered a traumatic head injury, including significant brain injury, bleeding within the

brain, and skull fractures. Torres also had blood and air within his chest wall cavity,

indicating a significant lung injury. Torres died after being removed from life support

on September 5, 2008.

An autopsy was conducted by Dr. Chrenka. According to Chrenka, the cause of

Torres's death was massive blunt trauma to the head. Tr. 882. But the manner of death

— homicide, suicide, accident, etc. — was deemed to be uncertain. Dr. Chrenka is board

certified as an anatomical, clinical and pediatric pathologist but he is not a board

certified forensic pathologist. Tr. 849-50.  Most of his work does not involve doing

autopsies, although he occasionally does them. Tr. 850-51.

The State's theory of prosecution was that Torres was pushed down the steps by

Dunn and, after he landed, Dunn found some object to bludgeon him with. The State

did not contend that the bat was the offending object. Instead, they theorized it was

likely some other instrument; but no other instrument was ever found. The only

evidence on this critical point came from two experts: a forensic pathologist and a blood

spatter expert from the Indiana State Police.

The State's theory required a different pathologist than Dr. Chrenka, who was uncertain on the manner of death. It found one in the person of Dr. Scott Wagner who practices out of Fort Wayne. Dr. Wagner was hired by the State to review the autopsy of Dr. Chrenka. Unlike Chrenka, Wagner is a well-qualified board certified forensic pathologist. Tr. 925-27. Wagner has testified hundreds of times, but 98% of the time he testifies for the State. Tr. 956. On direct examination, Wagner was never asked whether the fall could have caused the injuries to Torres. He simply said that the degree of trauma was severe, that Torres had multiple skull fractures and part of the skull was "crushed like gravel." Tr. 944-48. In addition, all of Torres's ribs were broken, as well as his clavicle. Tr. 939-41. There was no meaningful cross-examination of Wagner. Tr. 952. Counsel only confirmed that Wagner was being called for his second opinion on the cause and manner of death. *Id*. On redirect examination, the State finally got around to asking whether Dunn's injuries were consistent with someone falling down the stairs, and Wagner said they were not. Tr. 954-55.

As for the blood spatter evidence, there was substantial evidence of several people stomping around the crime scene. First, Dunn and Willie went up and down the stairs and walked next to Torres's body. Indeed, Dunn was seen standing next to Torres trying to forcibly pull him up by his arm. Both Dunn and Willie were standing near Torres when the police arrived. Officers Runyon, Weaver and Moore also were all seen walking around the crime scene near the body. Tr. 462, 724. There were photos admitted at trial which showed several people in boots standing right next to Torres's

body. Tr. 731-33, Trial Exhibit 26. Indeed, the photo shows what appears to be medics walking through the blood. Additionally, while the crime scene was being processed, it started to rain heavily. Tr. 764.

Notwithstanding this evidence of the crime scene having been disrupted, the State's blood spatter expert testified that nothing he saw suggested that the blood spatter could have been caused by stomping around the scene. Tr. 902. That expert was Dean Marks of the Indiana State Police. He has investigated crime scenes for 15 years and has specialized training in blood spatter analysis. Tr. 884-88. He has a Bachelor's Degree from Indiana University in sociology and forensic science. Tr. 885. He's evaluated 1500 crime scenes and has testified for the prosecution about 47 times around the State of Indiana. Tr. 887-88. Torres's blood was found on the wall at the bottom of the staircase. Marks determined from the pattern of the bloodstains that they were caused by "impact spatter" which means that some degree of force was applied to a blood source, causing the blood to disperse. According to Marks, the blood spatter pattern was not consistent with someone walking, or even stomping, through blood that was already pooled on the pavement, or with Torres simply falling down the stairs. Torres's blood was also spattered on a vehicle parked adjacent to the staircase and parallel to the bloodstained wall. There was "cast-off blood staining" on the concrete between the staircase and the vehicle, indicating that a bloody instrument of some kind had been "swung or flung[.]" Tr. 911.

-10-

The State charged Dunn with Torres's murder nearly two years after his death. As mentioned above, the State's theory of prosecution was that Torres fell down the stairs and, once he was at the bottom, Dunn bludgeoned him with a blunt object. The State conceded that the bat Torres was lying on was likely not the murder weapon. Instead, the State suggested that some other instrument was used by Dunn and later discarded in the few minutes before the police arrived. No such weapon was ever recovered.

The trial lasted four days but took nearly four weeks to complete. The trial commenced on Monday, January 31, 2011. After the second day of trial, a snow storm hit the area, as often happens in Elkhart County in January. Somewhat oddly, the trial did not pick up again until three weeks later on February 21. The following day, February 22, 2011, the jury returned a verdict convicting Dunn of first degree murder. Dunn was sentenced to a term of imprisonment of 58 years.

### Procedural History and Post Conviction Relief

After his conviction, Dunn appealed, arguing that there was insufficient evidence to support his conviction. DE 24-3 at 5. The Indiana Court of Appeals disagreed and affirmed Dunn's conviction and sentence. *Dunn v. State*, 959 N.E.2d 935 (Ind. Ct. App. Dec. 22, 2011) (table), *trans. denied* 963 N.E.2d 1119 (Ind. Feb. 13, 2012) (table); DE 24-5 at 7. Dunn sought transfer to the Indiana Supreme Court, but his petition for transfer was denied. *Dunn v. State*, 963 N.E.2d 1119 (Ind. Feb. 13, 2012) (table); DE 24-6.

Dunn timely filed a Petition for Post-Conviction Relief which was later amended by counsel. DE 24-7, DE 25-11. In that petition Dunn claimed that he received ineffective assistance of counsel during the trial of the case. In particular, Dunn argued that his lawyer never consulted with, much less hired, a forensic pathologist even though the cause and manner of death was the critical issue at trial. DE 25-11 at 107-09. A hearing was held, at which Dunn's trial counsel (Attorney Clifford Williams) and a forensic pathologist (Dr. Thomas Sozio) both testified. DE 25-9.

Dr. Sozio is a board certified and licensed forensic pathologist. He has done roughly 4500 autopsies in his career. He testifies throughout the State of Indiana as an expert pathologist on the cause and manner of death, and he usually testifies for the State. PCR Tr. 19-20. Recall that the critical issue at trial was whether Torres died falling down the steps or whether, as the State contended, he was bludgeoned to death after he fell. Dr. Sozio first testified that the autopsy conducted by Dr. Chrenka was substandard; he missed a lot. PCR Tr. 50. After reviewing all of the relevant materials, Dr. Sozio testified, contrary to the testimony of Dr. Wagner at trial, that Torres's injuries were much more consistent with a fall than with being bludgeoned by a blunt object. PCR Tr. 23-33.

Here's why: Dr. Sozio noted that Torres BAC was .294. Sozio opined that Torres's fatty liver was consistent with chronic alcoholism, and that chronic alcoholism is associated with reduced clotting times and greater susceptibility to broken bones. *Id.* at 29. Given that Torres was extremely intoxicated, and that the

staircase did not appear safe, Dr. Sozio "highly favored a fall" as the way in which Torres died. PCR Tr. 28-35. He explained that he reached this conclusion because he observed just one small laceration on Torres's scalp. Additionally, the skull fracture is more indicative of a fall because of the area of the injury on Torres's head. *Id.* at 34-35. What's more, the straight line break of several ribs was not at all consistent with him being battered. PCR Tr. 37. In sum, Sozio's opinion was as follows: "I don't believe [Torres] was struck at the bottom of the stairs." PCR Tr. 51.

Also testifying at the PCR hearing was trial counsel, Clifford Williams. Williams is a very experienced criminal defense attorney, but he conceded at the hearing that he had a myopic focus on the bat. The fact it was found under the victim "obscured" his judgment in the case. PCR Tr. 6. After all, he had two eyewitnesses on his side, Willie and Letha Sims, and he was confident. As he testified at the PCR hearing: "I'm going to be very blunt. I thought I won the case." PCR Tr. 11.

Williams testified that his theory of the case was that Dunn and Torres were drinking and had an argument that led to a physical confrontation. PCR Tr. 4. They were tussling at the top of the stairs. A bat became involved. They were struggling over the bat, each holding one end, when Torres fell down the stairs. Counsel believed that the State's theory of the case was that, however Torres got to the bottom of the stairs, Dunn struck him with the bat at the bottom of the stairs. PCR Tr. 4-5. In other words, Williams believed that the State's theory was that the bat was the instrument that was

used to bludgeon Torres, and since there was no DNA on the barrel of the bat, this would carry the day for him and his client. PCR Tr. 6.

*But that wasn't the State's theory*. As noted above, the State admitted in closing that "we don't know the baseball bat was the instrument and quite frankly the evidence suggests the contrary." Tr. 1015. They again conceded that it was likely some other instrument a few moments later: "Do we know what kind of weapon was used? No." Tr. 1018. In other words, the State would have the jury believe that the instrument used by Dunn to bludgeon Torres was discarded in the few minutes from the time the 911 call was made and the police arrived at the scene.

Williams admitted that he never consulted a pathologist or blood spatter expert, and did not bother to depose Dr. Chrenka or Dr. Wagner, despite rules in the State of Indiana that permit depositions in criminal cases. He further admitted that the blood spatter testimony "clouded" his judgment in the case. PCR Tr. 6-7. In the end, he conceded there was no "strategic reason" for not consulting an expert forensic pathologist in the case. PCR Tr. 8. If he had to do it over again, he would have had another person examine the blood spatter evidence. PCR Tr. 14.

After a hearing, the court denied Dunn's request for post-conviction relief. DE 25-11 at 121-29. In reaching this conclusion, the post-conviction relief (PCR) court noted that:

> [Dunn] has failed in his burden to develop evidence that establishes that consulting with another expert would have changed the outcome of the trial. The witness presented by [Dunn] simply provided another expert opinion as to the cause of death of the victim which lacks some credibility

when considered in connection with the totality of the evidence presented at trial.

*Id.* at 128. This was the wrong legal standard. The issue was not whether consulting with or calling a forensic pathologist "would have changed the outcome of the trial." Instead, under *Strickland v. Washington*, 466 U.S. 668 (1984), the issue was whether there was a "reasonable probability" of that occurring.

Dunn appealed, raising the same argument. *Dunn v. State*, 94 N.E.3d 367 (Ind. Ct. App. Oct. 31, 2017) (table), *trans. denied* 95 N.E.3d 1294 (Ind. Jan. 25, 2018) (table); DE 24-12. The Court of Appeals upheld the PCR court's judgment. *Id.* Dunn sought transfer to the Indiana Supreme Court, again raising only this issue. 95 N.E.3d 1294 (Ind. Jan. 25, 2018) (table). The Indiana Supreme Court denied transfer. *Id.*

### Proceedings in this Court

In his petition before this Court, Dunn argues that his trial counsel was ineffective for failing to retain an expert to testify on his behalf at trial and that he was not tried by a jury of his peers. DE 1 at 3. Respondent filed a response to the petition (DE 24), and Dunn filed a traverse (DE 27). After reviewing the record, I noticed that the trial exhibits were missing from the record and ordered the respondent to produce them. DE 30. The exhibits were produced (DE 31), and now that I have read the entirety of the record, the petition is ripe for adjudication.

## DISCUSSION

### A.    Claim Relating to Jury Selection

Dunn's first issue relates to jury selection. I have omitted any discussion of the

issue above because, as we will see in a moment, the issue has been procedurally

defaulted. The labyrinth of "procedural default" is where a lot of habeas cases go to die.

One way that a claim can be procedurally defaulted is if the petitioner fails to exhaust

all available remedies in State court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d

1019, 1025 (7th Cir. 2004). In other words, to get to the merits of a claim, a petitioner

must fully and fairly present the federal claim to the State courts. *Boyko v. Parke*, 259

F.3d 781, 788 (7th Cir. 2001).  Fair presentment requires "the petitioner to assert his

federal claim through one complete round of state-court review, either on direct appeal

of his conviction or in post-conviction proceedings." *Lewis*, 390 F.3d at 1025 (internal

quotations and citations omitted). "This means that the petitioner must raise the issue at

each and every level in the state court system, including levels at which review is

discretionary rather than mandatory." *Id.* at 1025-26. If he fails to do so, the claim is

defaulted. *Id.* at 1026. *See also Snow v. Pfister*, 880 F.3d 857, 864 (7th Cir. 2018).

 Respondent argues that one of the grounds raised by Dunn — the one dealing

with jury selection — is barred from review in federal court due to procedural default.

Dunn claims that he was not tried by a jury of his peers. Dunn did not raise this

argument on direct appeal. *Dunn v. State*, 959 N.E.2d 935 (Ind. Ct. App. Dec. 22, 2011)

(table), *trans. denied* 963 N.E.2d 1119 (Ind. Feb. 13, 2012) (table); DE 24-5 at 7. He also did

not raise this argument in his PCR petition. *Dunn v. State*, 94 N.E.3d 367 (Ind. Ct. App. Oct. 31, 2017) (table), *trans. denied* 95 N.E.3d 1294 (Ind. Jan. 25, 2018) (table); DE 24-12. Thus, I'm barred from reviewing the merits of this argument unless Dunn's procedural default can be overcome.

A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by State procedural rules and resulting prejudice from that failure. *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008), *cert. denied*, 556 U.S. 1239 (2009). Cause sufficient to excuse procedural default is defined as "some objective factor external to the defense" which prevented a petitioner from pursuing his constitutional claim in State court. *Murray v. Carrier*, 477 U.S. 478, 492 (1986). Ineffective assistance of counsel at the initial level of post-conviction proceedings can constitute cause for a procedurally defaulted claim of ineffective assistance of trial counsel. *Trevino v. Thaler,* 569 U.S. 413 (2013); *Martinez v. Ryan*, 566 U.S. 1 (2012). The Seventh Circuit has held that this exception applies to prisoners in Indiana. *Brown v. Brown*, 847 F.3d 502, 513 (7th Cir. 2017). However, "a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. 1, 14 (2012).

Dunn suggests that *Martinez* and *Trevino* apply here. Even if I assume that Dunn is arguing that his counsel was ineffective in failing to raise this argument at the initial level of his post-conviction relief proceedings and that *Martinez* and *Trevino* apply,

Dunn's procedural default cannot be excused because he has not shown that his argument is a "substantial one." Dunn argues that, of the fifty possible jurors, only one was an African American and that he was struck because he "had a problem with the judge when he was a prosecutor," relating to the long-ago prosecution of the juror's brother.  DE 1 at 3. The individual in question was a "Mr. Jackson." Tr. 257-89. Jackson revealed that his brother, Johnny Anderson, had been incarcerated for 42 years. Tr. 268, 276. He further revealed that he did not believe that his brother was guilty, and that the criminal justice system failed his brother. Tr. 269. When the prosecutor sought to use a peremptory strike to remove Jackson, the trial court judge recognized that, because Jackson was an African American, *Batson v. Kentucky*, 476 U.S. 79 (1986), was implicated. Tr. 277. He required the prosecution to state a race-neutral reason for striking Jackson. The prosecutor's stated reason was Jackson's forty years' worth of hostility to the criminal justice system related to his brother's conviction. Tr. 280. The prosecution pointed out that Jackson had very strong feelings about his brother's case and wanted to be sure that nobody else had to go through what his brother has suffered. Tr. 286. The trial court found that the prosecution had set forth a race-neutral reason for the peremptory strike. Tr. 289. Under *Batson*, "[u]nless a discriminatory intent is inherent in the [challenged party's] explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). There was no error in how the *Batson* issue was handled.

-18-

Dunn also claims that the jury in this case did not reflect a fair cross section of his peers. But while the Constitution entitles Dunn to an impartial jury, it does not entitle him to a jury of any particular racial composition. *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 630 (1991); *Teague v. Lane,* 820 F.2d 832, 843 (7th Cir. 1987), *aff'd,* 489 U.S. 288, 109 S.Ct. 1060 (1989). Counsel was not ineffective for failing to raise this issue.

In sum, I cannot find that Dunn has raised a substantial claim about jury selection at his trial or that he has demonstrated cause and prejudice such that his procedural default can be excused. His first claim relating to jury selection is therefore dismissed.

### B. Ineffective Assistance of Counsel

Dunn gets more traction on his second argument. He claims he was denied effective assistance of counsel when his lawyer failed to consult a forensic pathologist to testify on the cause of Torres's death — the crucial issue at trial. *See Strickland v. Washington*, 466 U.S. 668 (1984). Dunn's petition is governed by the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA allows a district court to issue a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The court can grant an application for habeas relief if the adjudication of his claim in State court either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States;" or (2) "resulted in a decision

that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding." 28 U.S.C. § 2254(d).

To prevail on an ineffective assistance of counsel claim, Dunn has to show that

counsel's performance was deficient, and that the deficient performance prejudiced

him. *Strickland v. Washington*, 466 U.S. 668 (1984). Regarding the deficient-performance

prong, great deference is given to counsel's performance, and the petitioner has a heavy

burden to overcome the strong presumption of effective performance. *Strickland*, 466

U.S. at 690; *Coleman v. United States*, 318 F.3d 754, 758 (7th Cir. 2003) (citation omitted).

A petitioner must establish specific acts or omissions that fall below professional norms.

*Strickland*, 466 U.S. at 690. The test for prejudice is whether there was a reasonable

probability that "but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Id.* at 694. A reasonable probability is a probability

"sufficient to undermine confidence in the outcome." *Id*. at 693. In assessing prejudice

under *Strickland*, "[t]he likelihood of a different result must be substantial, not just

conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

### 1.    Is the State Appellate Court Entitled to AEDPA Deference?

The first question is what standard of review governs here. A federal habeas

court must "attend closely" to the decisions of State courts and "give them full effect

when their findings and judgments are consistent with federal law." *Williams v. Taylor*,

529 U.S. 362, 383 (2000). A State court decision is contrary to federal law if the State

court arrives at a conclusion opposite to that reached by the U.S. Supreme Court or reaches an opposite result in a case involving facts materially indistinguishable from relevant U.S. Supreme Court precedent. *Bell v. Cone*, 535 U.S. 685, 694 (2002). On habeas review of an ineffective assistance claim, when the State court applied the correct legal standard, the inquiry is "whether the state court unreasonably applied *Strickland* . . . ." *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). In addition, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (*citing Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). This creates a "doubly deferential" standard of review. *Id.*

However, deference applies only when the state court applies the correct legal standard. *See Williams*, 529 U.S. at 383. When the state court applies the wrong standard, "the decision is not entitled to the usual AEDPA deference and is therefore reviewed *de novo* with the reviewing court applying the correct legal standard." *Mosley v. Atchison,* 689 F.3d 838, 844 (7th Cir. 2012).

Dunn argues that trial counsel provided ineffective assistance of counsel when he did not consult with a forensic pathologist on the critical issue at trial — the cause and manner of the victim's death. The Indiana Court of Appeals chose not to consider the first prong of *Strickland* — whether trial counsel's performance was deficient — and focused instead only on the second prong of *Strickland*: whether there was prejudice. At the outset of its analysis the Court of Appeals quoted directly from the trial court's

-21-

conclusion that consulting with a forensic pathologist "would have changed the outcome of the trial." DE 24-12 at 12-13. But this was the wrong standard.

It is true that when the Court of Appeals later stated the *Strickland* standard, it did so correctly on three occasions. *See* DE 24-12 at 14, 16 and 17. The problem is that the Court also incorrectly stated the standard a number of times, including in its ultimate conclusion. DE 24-12 at 2, 12-13, and 19. Indeed, after reviewing the evidence, the Court arrived at a conclusion affirming the trial court's denial of the petition based on a different, and more stringent, standard. Here's what the court said: "Based on this record, we cannot say that the evidence as a whole leads *unerringly and unmistakably* to the conclusion that the evidence produced from consulting with a forensic pathologist would have changed the outcome of Dunn's trial." DE 24-12 at 19 (emphasis added).

The terms "unerringly" and "unmistakably" did not come out of the clear blue. Those are the terms the Indiana Supreme Court has used in describing the standard of review under state law when a petitioner appeals the denial of a post conviction relief petition in Indiana state court. According to the Indiana Supreme Court, a petitioner must show that "the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court." *Wesley v. State*, 788 N.E.2d 1247, 1250 (Ind. 2003). But that is not the standard to be applied to Sixth Amendment claims of ineffective assistance of counsel. So when the Court of Appeals in this case concluded that "Based on this record, we cannot say that the evidence as a whole leads unerringly and unmistakably to the conclusion that the evidence produced from

consulting with a forensic pathologist would have changed the outcome of Dunn's trial" it was conflating the federal ineffective of counsel standard with the State PCR review standard. DE 24-12 at 19. And that was an error.

Application of the wrong standard can make all the difference in the world. This case proves the point. To say that something would "unerringly" and "unmistakably" change a result is a far cry from saying there is a reasonable probability (as required by *Strickland*) that the result would have been different. Indeed, it is precisely this sort of error that the United States Supreme Court determined constitutes a decision contrary to federal law in *Williams v. Taylor*, 529 U.S. 362 (2000):

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. Take, for example, our decision in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed 2d. 674 (1984). If the state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be diametrically different, opposite in character or nature, and mutually opposed to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a reasonable probability that the result of the proceeding would have been different.

*Id.* at 383 (internal quotations omitted).

A similar error was made by the State court in *Mosley v. Atchison*, 689 F.3d 838 (7th Cir. 2012). In *Mosley*, the State court required the defendant claiming ineffective assistance of counsel to show that "the results of the proceeding would have differed" not that there was a "reasonable probability" of a different result but for counsel's errors. *Id.* at 850. This was found to be a critical error. As the Seventh Circuit noted in granting habeas relief: "This is not a mere detail or quibble over word-smithing." *Id.* at

-23-

850, citing *Williams,* 529 U.S. at 405-06, *see also Martin v. Grosshans*, 424 F.3d 588, 592 (7th

Cir. 2005).

What's more, this is not a case where the Court of Appeals correctly stated the

standard and then later in the opinion merely used a shorthand version of the standard

when applying it. This type of error — using a shorthand reference or imprecise

language in enunciating the *Strickland* standard— has been held to not be a

misapplication of *Strickland. See e.g. Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (using a

"shorthand" or "imprecise" recitation of the *Strickland* standard is not a misapplication

of *Strickland*); *Sussman v. Jenkins,* 636 F.3d 329, 360 (7th Cir. 2011) (using a "shorthand"

version of the *Strickland* does not lead to a loss of AEPDA deference); *Stanley v. Bartley*,

465 F.3d 810, 813 (7th Cir. 2006) (stating the *Strickland* standard "imprecisely" does not

lead to a loss of AEDPA deference); *Woods v. Schwartz*, 589 F.3d 368, 375, n. 3 (7th Cir.

2009) (same).

It is one thing to say that the state court used "imprecise" language or a

"shorthand" reference in announcing the *Strickland* standard.  It is an altogether

different thing when the court applies a totally different standard — and a much more

stringent one at that — as was done here. As the court concluded in *Mosley*, "The state

appellate court did not merely recite the wrong standard or use an inept shorthand

expression of the standard. It applied an incorrect and more onerous standard, and the

difference may well have been decisive." *Mosley*, 689 F.3d at 850-51. By asking whether

-24-

failing to consult an expert pathologist would have "unerringly and unmistakably" changed the result, the Indiana Court of appeals made the same mistake here.

In sum, while the Court of Appeals in this case stated the correct standard, it applied the incorrect one. Dunn was not required to demonstrate that the testimony of a forensic expert would have "unerringly" and "unmistakably" changed the outcome of his trial. Instead, he had to demonstrate that, but for counsel's error, there is a reasonable probability that the result would have been different. And because the Indiana Court of Appeals did not correctly apply the *Strickland* standard, I am not bound by the doubly deferential standard that typically must be applied when reviewing a habeas corpus petition challenging a conviction. Rather, I must give *de novo* review to Dunn's assertion that his trial counsel was ineffective.

### 2.  The Performance Prong of *Strickland*

Applying *de novo* review, I'll begin by considering whether Dunn has met his burden of demonstrating that counsel's performance fell below professional norms — a question the Indiana Court of Appeals did not address. Dunn's counsel's theory of the case was that Dunn and Torres were drinking and had an argument that led to a physical confrontation. They tussled on the shared balcony just outside their apartments. A bat was involved, and they struggled over the bat. During that struggle, Torres fell down the stairs. PCR Tr. 4. Counsel's recollection of the State's theory of the case was that, however Torres got to the bottom of the stairs, Dunn struck him with the bat once he was at the bottom of the stairs. PCR Tr. 4-5. After sending an investigator to

the scene, counsel felt that his theory of defense made sense, given the unsafe balcony, the lack of DNA found on the barrel of the bat, and the position of the bat underneath Torres. PCR Tr. 5-6. Counsel did not consider consulting with a forensic pathologist on the case. PCR Tr. 6-8. He was focused on how the bat was not the murder weapon, and he admits that this misplaced focus "obscured [his] judgment." *Id.* In other words, he did not make a strategic decision not to consult with a forensic pathologist. PCR Tr. 8. He simply did not consider it.

Often, the decision not to consult an expert is the sort of strategic choice that requires my deference, but here counsel admits that his failure to consult an expert was not a strategic decision. When trial counsel never considers an issue, it is difficult to say the decision was a strategic one. *See Thomas v. Clements*, 789 F.3d 760, 768 (7th Cir. 2015) ("In many cases, we would chalk such a decision up as strategic or tactical... . But we cannot reach such a conclusion because counsel admitted his failure to reach out to an expert was not a conscious decision — he just did not think to do so.").

By focusing on the bat, Dunn's counsel seemingly had a fundamental misunderstanding of the State's theory of the case. In opening statement, the prosecutor conceded that there was a lack of consensus about how Torres ended up at the bottom of the stairs, but that the consensus was that he did not move once he was there. Tr. 344-45. The prosecutor indicated that an expert would testify that Torres's injuries were not consistent with a fall but were instead consistent with being struck multiple times with a blunt object. *Id.* at 345. The prosecutor conceded in closing that the blunt object wasn't

-26-

the bat "and the evidence suggests the contrary." Tr. 1015. Thus, the bat was not

essential to the prosecution's theory of the case, and the lack of evidence that the bat

was the murder weapon did little to exonerate Dunn. Counsel should have recognized

that the State would produce evidence from experts that Torres's injuries and the blood

spatter pattern were both inconsistent with a fall. In other words, the State's evidence

on the crucial issue at trial — did Torres die in the fall or was he bludgeoned after the

fall? — was not based on the bat but, instead, entirely on the two experts. Yet trial

counsel did nothing to counter it.

What's more, reliance by Attorney Williams on the pathologist who did the

autopsy (Dr. Chrenka) was unwise.  Chrenka was unwilling to opine on whether Torres

died falling or by being struck by an instrument. And Chrenka only occasionally does

autopsies and he is not a forensic pathologist. Yet, despite this uncertainty, Williams

still didn't think to consult with a board certified forensic pathologist. That was a

monumental oversight. There are cases, albeit not many, where "the only reasonable

and available defense strategy requires consultation with experts or introduction of

expert evidence, whether pretrial, at trial, or both." *Harrington v. Richter*, 562 U.S. 86, 106

(2011). This was one of those cases.

Interestingly, just a few weeks ago, the Seventh Circuit issued an opinion that is

oddly similar to this one. The similarity starts (but doesn't end) with the surname of the

defendant: "Dunn." *See Dunn v. Jess*, No. 20-1168, 2020 WL 6883423 (7th Cir. Nov. 24,

2020). In that case, the court held that the failure of trial counsel to call a forensic

pathologist amounted to deficient performance under the performance prong of *Strickland* even though trial counsel actually consulted with an expert prior to trial. The Seventh Circuit held that the error was trial counsel's failure to use what he had learned in his interview of the pathologist. Under those circumstances the Seventh Circuit found that it was "[u]nreasonable to view trial counsel's decision to consult with a forensic pathologist as satisfactory performance, considering trial counsel did not use the crucial information gleaned from that consultation." *Id.*

This case is worse than that *Dunn.* Perhaps it is a little too facile to say, but if interviewing a forensic pathologist but not using what is gleaned from the interview amounts to subpar performance, then, surely, failing to even consult with a forensic pathologist in a case like this — where the entirety of the State's case was based on expert testimony — must likewise be considered ineffective assistance of counsel. The simple fact of the matter is that this case cried out for a forensic pathologist on the defense side. It's not an exaggeration to say that *how Torres died is the whole case.* Without expert testimony to support his claim, counsel's theory that Torres died when he fell didn't have much of a chance.

It is true that Letha and Willie testified in a manner consistent with that theory. But their testimony was not without problems as the State aptly noted. Counsel knew or should have known before trial that their testimony would be directly contradicted by experts who would offer opinions as to how Torres died. In the absence of supporting evidence from an expert like Dr. Sozio, it was unlikely that the jury would accept the

testimony of Letha and Willie. In other words, if counsel's theory of defense was that

Torres died from a fall, he needed to do more than rely on Letha and Willie; he needed

expert testimony that offered an alternative to the testimony of Dr. Wagner. Dr. Sozio

would have provided that. With all due respect to counsel, the failure to consult with an

expert pathologist fell below professional norms.

### 3.    The Prejudice Prong

The next question is whether there is a reasonable probability that, but for

counsel's error, the results of the trial would have been different. In other words, was

Dunn prejudiced by counsel's error?  The starting point in answering that question is

the strength of the State's case. As *Strickland* observes: "a verdict or conclusion only

weakly supported by the record is more likely to have been affected by errors than one

with overwhelming record support." *Strickland*, 466 U.S. at 696. Thus, the quantum of

doubt necessary to reach the threshold of "reasonable probability" that the verdict

would have been different is far less in cases where the evidence isn't strong to begin

with. And this was not a strong prosecution case.

Recall that the State argued that the evidence showed that Dunn and Torres were

fighting on the balcony outside their apartments, Torres probably fell down the stairs,

and Dunn then fatally beat Torres with an unidentified object. Tr. 1016-18. But if Dunn

savagely bludgeoned Torres to death at the bottom of the stairs, why did he stick

around the scene? What's more, Letha contradicted the State's theory by testifying that

when she went outside shortly after she heard a loud noise, she saw Torres on the

ground and Dunn still at the top of the stairs. Tr. 521-22. She also testified that she did

not see Dunn injure Torres. In fact, Letha testified that Dunn went to Torres and tried to

get him up. Tr. 521-25. Her testimony, if credited, is highly favorable for Dunn. It

provides an alternative explanation for why Dunn's shoes had blood on them, and why

Dunn's bloody footprints were found around the scene. It tends to disprove the State's

theory that Dunn beat Torres at the bottom of the stairs. And, it suggests that Dunn's

intent was inconsistent with that required to find him guilty of murder.

What's more, Willie's testimony was even more on point. *He was an eyewitness.*

He saw Torres strike Dunn with the bat. This was corroborated by the photos of Dunn's

back taken at the hospital as well as what Dunn told the attending physician when

asked how he got hurt: he was hit by a baseball bat. Willie testified consistently that he

saw Dunn and Torres struggling over the bat and Torres fell down the steps in that

struggle. Tr. 604-36. At no time did Willie see Dunn strike Torres. T. 624, 630. If

credited, this specifically contradicts the State's expert testimony that suggested that

Torres was bludgeoned after he fell.

It bears repeating that the State did not insist that the bat found under Torres was

the murder weapon. They theorized that some other instrument was used. Tr. 1015,

1018. But when police arrived only a few minutes after the incident occurred, they could

not find a murder weapon. In any event, undoubtedly, the reason the State did not

argue that the bat found under Torres was the murder weapon was because there was

-30-

no evidence to support such a claim. So, instead, they lobbed an alternative theory

involving a phantom instrument with little evidence to support it.

As for Letha and Willie, according to the State, they're just a couple of liars

because their testimony was not consistent with the State's experts. Here's how the State

presented it as a binary choice in closing arguments:

> Ladies and gentlemen, this case really does boil down to what you're
> going to believe. Are you going to believe people who are demonstrated
> to lie, or are you going to look at people whose reputations, whose entire
> professions and their life's work has been to figuring out mysteries?

Tr. 1024-25.   But the question at this point is how would jurors weigh the testimony of

Letha and Willie if they had also heard from an independent forensic pathologist like

Dr. Sozio who would have supported Letha and Willie's first hand accounts of what

happened.

And, by the way, why would Letha and Willie lie for Dunn anyway? The State

never offered a motivation for lying. After all, Letha and Torres were close friends.

What's more, Letha no longer had an attachment to Dunn. Letha's relationship with

Dunn ended shortly after Torres's death and she moved to Michigan City, Indiana, and

she didn't see Dunn anymore. Tr. 554, 561-63. Nonetheless, the State argued in closing

that Letha and Willie were simply lying. Tr. 1101. But when their testimony is

supported by a forensic pathologist like Dr. Sozio, the State's theory that they are

nothing more than a couple of liars loses much of its traction.

-31-

If Dunn's trial counsel had consulted with Dr. Sozio prior to trial, he could have learned that Dr. Sozio believed that a fall was the most reasonable explanation for Torres's injuries. First, Dr. Sozio concurred with Dr. Chrenka that the manner of death was "undetermined." Neither could conclude whether the manner was homicide, accident or suicide. So both felt the most cautious approach would be to call it "undetermined." But unlike Dr. Chrenka, Dr. Sozio offered a number of reasons for his conclusion that Torres died as the result of the fall. The jury, of course, heard none of it.

The jury did not get to hear that Torres had a laceration in an area associated with falls. PCR Tr. 34. The jury did not get to hear Dr. Sozio's testimony that the type of skull fracture Torres suffered is more indicative of a fall. *Id.* at 35. The jury did not get to hear that blood could spew from a skull fracture, and that, even though he isn't a blood spatter expert, the location of the blood — low to the ground — was significant to his opinion regarding the manner of death. *Id.* at 41. The jury did not get to hear that his opinion was based in part on the circumstances: that Torres was highly intoxicated and on the top of a staircase that did not appear safe. *Id.* at 31. Finally, the jury did not get to hear Dr. Sozio testify that Torres's fatty liver was consistent with chronic alcoholism, and that chronic alcoholism is associated with reduced clotting times and greater susceptibility to broken bones. *Id.* at 29.

It's certainly true that after hearing all this evidence the jury could have found that Torres was pushed down the steps by Dunn and died. And perhaps this could have resulted in a murder conviction or more likely a conviction of a lesser offense such as

voluntary manslaughter or criminal recklessness. *See* I.C. § 35-42-1-3 (voluntary manslaughter) and I.C. § 35-42-2-2 (criminal recklessness). But the State never offered this as a viable theory. Instead, it had a single theory of the case: Torres was bludgeoned after he fell. Dr. Sozio's testimony would have created substantial doubt about that theory especially since Sozio's opinion happened to be consistent with the testimony of the two eyewitnesses.

In sum, I am of the firm belief that Dunn was denied the effective assistance of counsel, and but for counsel's errors, there is a reasonable probability that the results of the trial would have been different.

### CONCLUSION

For the foregoing reasons, habeas corpus is CONDITIONALLY GRANTED. The State of Indiana may re-try Dewayne A. Dunn, provided that it files appropriate documents to do so in the State trial court within 120 days of this Order. The respondent is ORDERED to file a notice in this court within 150 days of this Order demonstrating that Dewayne A. Dunn has either been released or that the State of Indiana has initiated re-trial proceedings against him.

SO ORDERED on December 23, 2020.

  /s/Philip P Simon
UNITED STATES DISTRICT JUDGE

-33-